## THE SENECA COUNTY BANK *vs.* SCHERMERHORN.

The maker of two promissory notes which were past due, in order to obtain a renewal for three months, agreed with the holder to give him a new note for the aggregate amount of principal, and pay the discount upon it and the back interest, and, *in addition*, to transfer to the holder *at par*, drafts on New-York and Albany *worth three-fourths of one per cent. premium*, to an amount equal to the debt; *held*, that the new note given pursuant to the arrangement was void for usury.

ASSUMPSIT, tried before MOSELEY, C. Judge, at the Wayne circuit in February, 1844. The defendant was sued as the maker of a promissory note for $2500, dated July 4, 1842, payable at the bank on the first day of October following. The defence

was usury in a prior note which formed the consideration for this. On the 6th day of November, 1841, the defendant had in the bank two notes then past due—one for $2000, payable at the Merchant's Exchange Bank in the city of New-York; and the other for $1500, payable at the Seneca County Bank. There had been a payment of $500 on these notes, leaving $3000 due, besides interest. On that day the defendant went to Joseph Fellows, the president of the Seneca County Bank, who resided at Geneva, to make arrangements for obtaining a renewal of the two notes. He purchased of Fellows two drafts, one drawn by Fellows on the city of New-York for $2244; and the other drawn by Benedict & Co. on the city of Albany for $756— making in all $3000. Both were good drafts, which were paid on presentment. For these drafts the defendant paid Fellows three-fourths of one per cent. premium, amounting to $22,50— that being the lowest market value of the drafts at the time. The defendant made a new note for $3000 on the same 6th of November, 1841, payable at the bank three months after date. He made arrangements with Fellows to pay the interest on the two notes then in the bank, and the discount on the new note; and requested him to let the bank have the two drafts, and obtain a renewal of the notes then in the bank. On the same day Fellows went to the bank and completed the arrangement as the defendant had desired. The cashier took the new note as a renewal of the old notes, and Fellows paid the interest due on those notes; and the discount on the new note; and gave the bank the two drafts, amounting to $3000, which the bank placed as a deposit at par to the credit of Fellows. In his testimony *Fellows* said, the defendant's proposition was, that if I would procure the renewal of the old notes, he would purchase drafts as before stated; and I accordingly submitted to the financial officer of the bank his proposition for a renewal of the notes, and it was accepted. There was no instruction from Mercer, the cashier, to the witness, and no agreement between Mercer and the defendant that witness knows of. I simply carried Schermerhorn's proposition for a renewal, to the bank. I was the bearer of the offer to the bank. I took the note and drafts to

the bank, and the latter were passed to my credit on the books of the bank at par. *Mercer*, the cashier, testified, that Fellows told him the drafts were for the benefit of the defendant: that Fellows presented the drafts and the note at the same time, and said the defendant had sent the note for renewal: that it was all done at one time, but the transactions were not based upon each other. The bank was not then buying drafts. The $3000 note of the 6th of November, 1841, was renewed on the 9th of March, 1842, by another note of the same amount, payable on the first of July following. On the last mentioned note $500 was paid when it became due on the 4th of July, 1844, and the balance was renewed by the note in suit. The judge thought there was no question for the jury, and under his direction they found a verdict for the plaintiffs. The defendant moves for a new trial on a case.

*J. C. Spencer*, for the defendant, cited 2 *Hill*, 451, 465; 10 *Wend.* 116; 21 *id.* 105; 16 *John.* 375; 3 *Cowen*, 284; 2 *id.* 678, 712; 8 *id.* 670.

*S. Stevens*, for the plaintiffs.

*By the Court*, BRONSON, Ch. J. The question is, whether the note of November 6th, 1841, from which the one in suit is a lineal descendant in the second degree, was not contaminated with usury. The following facts were either proved, or might be inferred by a jury from the facts which were proved. On the day which has been mentioned, the defendant had two notes lying in the bank, which were past due, and on which the amount of principal unpaid was three thousand dollars. He went to Mr. Fellows, the president of the bank, for the purpose of obtaining a renewal of the notes for three months; and to that end he made a new note for three thousand dollars, payable in three months, which was delivered to Mr. Fellows, who was also furnished with a sufficient amount of money to pay the interest which had accrued on the old notes, and the discount on the new one. If the matter had stopped there, and

the proposed arrangement had been carried into effect, the bank would have got legal interest, and nothing more, for the forbearance of the debt. But the defendant also placed in the hands of Mr. Fellows two drafts amounting to $3000, which, at the lowest market value, were worth twenty-two dollars and fifty cents more than the nominal amount; and these drafts were to be offered to the bank in such a way that the premium which they were worth in the market should operate as an inducement, beyond the legal interest, for extending the time of payment. Mr. Fellows went to the bank as the defendant's agent, and, in that character, completed the proposed arrangement with the cashier. He paid the interest then due on the debt, delivered a new note for the principal of the debt, and paid the discount on the new note for the time it had to run. As an additional inducement to make the arrangement, he offered to the bank, and the bank received, the excess of the market, over the par value of the two drafts, amounting to twenty-two dollars and a half. Now to my mind, this makes out a plain case of usury. I do not see how it differs in principle from the payment in money of an equal amount beyond the legal interest. The language of the statute is broad enough to reach every possible shift or contrivance by which the lender may attempt to secure to himself more than the established rate of interest. The words are—" no person or corporation shall, directly or *indirectly*, take or receive in money, goods, or *things in action*, or in *any other way*, any greater sum, or greater *value*, for the loan or forbearance of any money, goods, or things in action, than is above prescribed." (1 *R. S.* 772, § 2.) It includes every possible way in which the lender or creditor may take or receive more than at the rate of seven per centum per annum for the loan or forbearance of money.

It is, I think, clear that the bank got the premium on the drafts. It seems that the defendant did not pay Mr. Fellows the face of the drafts; but only the premium. If the defendant had paid in full for the drafts, they would then have been passed to his credit by the bank; and would, with the other funds, have fully paid his debt. But that was not what he desired.

He wanted further day of payment; and so the matter was understood by all of the parties. The bank took the drafts, and placed the par value to the credit of Mr. Fellows; and for the difference between the par and the market value, no credit was given to any one. It was so much money or value which the bank received, beyond legal interest, for the forbearance of the debt.

The arrangement which the defendant made to obtain the use of drafts for which he was unable to pay, and which he did not intend should be passed to his credit, shows very plainly that his object was, to offer a bonus to the bank for the renewal of the loan. And the matter must have been so understood by the cashier. Mr. Fellows very fairly performed his contract, and his duty to the defendant as an agent. Although the nominal amount of the drafts belonged to him, and was therefore properly passed to his credit, he told the cashier that the drafts were for the benefit of the defendant. He presented the drafts as a part of the defendant's proposition for a renewal of the loan, and the proposition was accepted by the bank. Mr. Fellows knew, of course, that the premium on the drafts was offered as a bonus, beyond the legal interest, for the renewal of the loan. And the cashier could not have seen the matter in a different light. The thing spoke for itself. The defendant stood there by his agent asking a renewal; and offering the drafts, the interest and discount money, and the new note; but saying at the same time, that the nominal amount of the drafts was to be paid or credited to Fellows. No man can wink so hard as not to see, that the premium on the drafts was offered and received as a part of the inducement for extending the loan. If the cashier did not see it, he was unfit for his place: and if he did see it, he should have let the drafts alone.

It was suggested by the plaintiffs' counsel that Mr. Fellows, and not the bank, received whatever there was of usury in the transaction. But that is an entire mistake of the facts. He received nothing more than the lowest market value for the drafts; and although it may seem at the first thought as though

he sold the drafts and still kept them himself, yet such is not the fact. It is true that the bank gave him credit for the nominal amount of the drafts ; but that was only the mode in which he was paid a part of their market value. The sum paid by the defendant in money, with the addition of the bank credit, only amounted in the aggregate to the market value. And the drafts did not return to Fellows. They had the appropriate effect of transferring so much of his funds in New-York and Albany to the bank. It was precisely the same thing to him as though the defendant had paid the whole price of the drafts in money, and had then sold them to the bank, or disposed of them in any other way. And clearly, it made no difference to the bank whether it paid the price of the drafts to Fellows or to the defendant. In point of fact it has only paid a part of the value to any one, the residue having been retained as a bonus for the renewal of the loan.

The cashier testified, that the renewal note was submitted to him, and was *not connected with a proposition to pay the old notes in current drafts.* On cross-examination he said, that Mr. Fellows told him the drafts were for the defendant's benefit: that he presented the drafts and the note *at the same time*, and said the defendant had sent the note for renewal : that it was *all done at one time ; but the transactions were not based upon each other.* The last remark involves a distinction which I cannot see, and which, I think, none but a usurer can comprehend. The debtor comes, by his agent, with his renewal note, his interest and discount money, and his additional bonus, all in hand, and says to the creditor, "take these, and extend the time for payment ;" the creditor accepts the proposition, and then tells us that "the transactions were not based upon each other." If the matter had been left to the jury, they would not have been likely to come to any such conclusion.

It is of no consequence that the offer to pay more than legal interest came from the defendant. That is but the common case. It is enough that the lender or creditor receives more than he has a legal right to demand. Nor is it necessary that it should be received in the name of usury. If more than the

law allows is intentionally received for the use of the money, or the forbearance of the debt, the transaction cannot be supported.

The cashier testified, that the bank, at the time in question, was not buying drafts ; and it was urged on the argument that these drafts may not have been worth any thing more than par to the bank. But the cashier further testified, that the bank then charged from three-fourths of one per cent. to one per cent. for drafts on New-York. · This renders it highly probable that the drafts were worth something more than par to the bank. But if the plaintiffs do not like to be governed by their own prices, they cannot complain if we take the market value, and, according· to the testimony of the president, three-fourths of one per cent. was the lowest market price for drafts on New-York at the time in question. It is impossible, therefore, to deny, that the drafts were worth something more than par to the bank. And whatever the sum may be, it was so much received for the forbearance of the debt beyond what the law allows.

If the facts proved did not conclusively make out such a case as I have stated, they at least made a question for the consideration of the jury.

New trial granted.