CUYLER & SEXTON *vs.* SANFORD and others.

Where, in an action upon a promissory note, the defence set up, under a plea of the general issue, is that the consideration of the note was in violation of the laws in restriction of banking, proof that the consideration of the note was bills issued by the plaintiffs to be put in circulation as money, will not throw upon the plaintiffs the burthen of proving that they were authorized by law to issue the bills.

Under such an issue the *onus* of showing that the plaintiffs were not authorized to issue the bills, is thrown upon the defendant.

The first section of the act of 1835, which makes it unlawful for any *moneyed incorporation* to charge or receive the premium of exchange on any draft made by it which shall be used or applied in the payment of any bill or note, discounted by such corporation, does not apply to *individual bankers.*

Although associations formed under the general banking law are corporations, yet an individual banker can not be so considered.

In a case where there is evidence tending to show that the premium of exchange, charged upon the sale of a draft, is unreasonable or exorbitant, as a general rule, the question should be submitted to the jury to say whether the transaction was intended as a cover for usury.

ASSUMPSIT, tried at the Wayne circuit in December, 1848, before SILL, justice. The action was against Sanford as maker, and Petit and Johnson as indorsers of a promissory note in the words and figures following:

"$1000.                    Palmyra, January 3d, 1848.

Thirty days from date I promise to pay to the order of J. C. Petit, one thousand dollars, payable at the Farmers' Bank of the city of Troy, for value received.        J. L. SANFORD."

The execution of the note by Sandford, the indorsement by the other defendants, and the due protest of the note, and notice thereof to the indorsers, were proved. The plaintiffs also proved a computation of the amount due on the note, which after allowing a payment which appeared indorsed on the note, amounted at the time of the trial to $902,59. The plaintiffs then rested.

On the part of the defendants it was proved that from the first of November, 1846, to the time of the trial, the plaintiffs

resided at Palmyra and carried on banking business there; that during that time they kept a banking office and had been associated as partners; that they were individual bankers and each had a bank, and had issued bills and circulating notes of their respective banks, and loaned and put them in circulation as money; that they had issued drafts in the name of Cuyler's Bank, in which name they had done their banking business; that they had also issued certificates of deposit. On discounting notes they occasionally, but not usually, issued drafts. That drafts had been issued signed by Cuyler as president and Stephen P. Seymour as cashier, and that the plaintiffs had transacted banking business generally. It also appeared that the note in suit had been discounted by the plaintiffs on the 1st day of January, 1848, and at the same time the plaintiffs sold Sanford a draft for $1000 on the Mechanics' and Farmers' Bank at Albany, charging him one-half of one per cent premium, and applying the proceeds of the note towards paying for the draft. The discount on the note was computed from the 1st of January to the 5th of February. The draft was purchased by Sanford for the purpose of taking up another note of the defendant Sanford of the same amount, payable in Troy, which had been discounted by the plaintiffs, and which would fall due on the 3d day of the same month of January. The last mentioned note still belonged to the plaintiffs when the note in suit was discounted, having been sent forward to Troy for collection. When it was discounted the plaintiffs paid the proceeds to Sanford in the bills of their banks. When the note in suit was discounted, Sanford applied to the plaintiffs to renew the other one, and presented the note in suit for that purpose, saying he wanted a loan of a thousand dollars a short time, as he had produce east. The plaintiffs refused to renew, but agreed to discount the one in suit, and offered him a draft or currency at his election, and he chose to take the draft.

It also appeared that Sanford was a merchant residing and doing business in Palmyra, and had been such from a period prior to the discounting of the first note down to the time of the trial; that at the time of issuing this draft the plaintiffs were

charging five-eighths of one per cent on the sale of drafts on Albany, which was the current rate of exchange with them between Palmyra and Albany. That the Bank of Geneva generally charged one-half of one per cent. After the evidence was closed on both sides, the defendants' counsel insisted that the plaintiffs were not entitled to recover, for the following reasons: 1. That the note was void, the consideration being in violation of the laws in restriction of banking. That there was no evidence that the plaintiffs were specially authorized by law to keep an office for the purpose of issuing evidences of debt, to be loaned or put in circulation as money, &c. and that without such evidence, the discounting of the first note by giving therefor the bills of the plaintiffs' banks, and of the second note by giving the bank draft, were unauthorized and illegal, &c. 2. That the note was void in consequence of the premium on exchange taken by the plaintiffs on the sale of the draft, the act of 1835 prohibiting corporations from selling drafts to pay notes discounted by them, being applicable to the plaintiffs. 3. That the note was usurious.

Whereupon the circuit judge decided that upon the proof the plaintiffs were not entitled to recover, and directed a nonsuit to be entered. A motion was now made to set aside the nonsuit, and for a new trial.

*A. Worden,* for the plaintiffs.

*T. R. Strong,* for the defendants.

*By the Court,* WELLES, J. The case does not show upon what ground the plaintiffs were nonsuited; whether upon one, or more, of those stated by the defendants' counsel. They were all insisted upon at the argument, and it becomes necessary, therefore, to consider them all.

The first ground taken at the trial, by the defendants' counsel, was that the consideration of the note was in violation of the laws in restriction of banking. (1 *R. S.* 712, § 1, *restricted and modified by* § 1, *ch.* 20, *of Laws of* 1837.) The statutes here

referred to prohibit persons, associations of persons, and bodies corporate, not expressly authorized by law, from issuing evidences of debt to be loaned or put in circulation as money ; and also from issuing any bills or promissory notes, or other evidences of debt, as private bankers, for the purpose of loaning or putting them in circulation as money.

The defendants claim that the proof at the trial established the fact that the consideration of the first note was the bills issued by the plaintiffs and which were within the description of those prohibited by the above statutes ; and that as there was no proof that the plaintiffs were authorized by law to issue the notes, the note of the defendant Sanford, first discounted, was contrary to law, and void. That the second note was discounted to enable the maker to pay the first, and that the consideration of the second was thereby contaminated and rendered void by the illegality of the first. Does the proof legally establish that the first note was void ? In my opinion it did not go far enough. It did not show that the plaintiffs had not the right to issue circulating notes. Suppose the plaintiffs had paid Sanford in bills of some bank of another state, or of the Bank of England, would it not be a strange proposition, that in a suit upon the note, the plaintiffs would be obliged to prove that the bank by which the bills were issued was legally incorporated, with authority to issue bills for circulation ? and if the bills had been issued by one of the best safety fund banks in this state, it is difficult to perceive why the plaintiffs would not be under the same obligation to prove that the bank by which they were issued was duly incorporated, and had authority to issue the bills.

Prior to the revised statutes, under the plea of the general issue, in an action brought by a corporation, in its corporate name, the plaintiff was bound to prove its corporate existence, or be nonsuited. (*Bank of Auburn* v. *Weed*, 19 *John.* 300. 2 *R. S.* 458, § 3.) The rule, however, only applied to the case of a corporation attempting to sustain an action in its corporate name. The general rule is, that a party holding the affirmative of an issue is bound to establish it by proof. How stands the issue here ? The plaintiffs seek to recover the amount due

Cuyler *v.* Sanford.

on the note. The allegation of the defendants is, that they did not undertake and promise, &c. Upon the trial, the plaintiffs introduce and prove the note, and give the necessary evidence to charge the indorsers, and rest. They have thus proved the issue on their part, and await the proof from the other side. The position of the defendants is, that although *prima facie* they are liable in the case thus made out by the plaintiffs, yet that the note upon which such *prima facie* liability arises, was given under such circumstances as to render the transaction illegal, and therefore the law will not enforce any promise therein contained, or which would otherwise be implied. This is an affirmative proposition of the defendants, which they are bound to establish. To do so, they give evidence, showing that the plaintiffs each had a bank, that they had issued circulating notes or bills of such banks, and that the first note was discounted by the plaintiffs by giving the defendant Sanford such bank notes; that the second note is a continuation of the debt thus created; and they claim, that having proved so much, the burthen of proof is changed, and it then becomes incumbent upon the plaintiffs to prove that they were authorized by law to issue the bills. To this I cannot assent. It would be a most inconvenient and oppressive rule. In the first place, the defence in this respect charges upon the plaintiffs the commission of an act which is highly penal. It not only subjects them to the forfeiture of the amount of the note or other security, taken for the bills thus issued, but to the penalty of one thousand dollars. (1 *R. S. 3d ed.* 894, § 7.) In the next place, I am not aware of any good reason why the *onus probandi* should be shifted at the point in question. It would have been quite as easy for the defendants to prove that the plaintiffs were not authorized to issue the bills, provided such was the fact, as for the plaintiffs to show that they were, on supposition that they had authority. The absence of authority would be made out, at least *prima facie*, by the certificate of the secretary of state of a diligent examination in his office for the papers required to be filed or deposited there, and that none were to be found; or if found, authenticated copies would expose any legal defect there might be in them.

Cuyler *v.* Sanford.

(2 *R. S.* 552, § 12.)   Or, if the personal attendance as a witness of that officer or of his deputy or clerks was necessary upon the trial, the defendants could as well obtain them as the plaintiffs. (*Rex* v. *Rogers*, 2 *Campb.* 654.   *Rex* v. *Jarvis*, 1 *East*, 643, note *k.*)

The defendants also contend that the note in suit was void in consequence of the premium of exchange taken by the plaintiffs on the sale of the draft.   The law upon which this objection is founded is sect. 1 of ch. 307 of the session laws of 1835, (1 *R. S.* 3*d ed.* 727, § 32,) and applies only to moneyed corporations.   The section makes it unlawful for any *moneyed incorporation* to charge or in any manner receive the premium of exchange on any draft made by such corporation which shall be used or applied in the payment of any bill, note, or other demand, due to or discounted by such corporation.

It is settled that associations formed under the general banking law are corporations.   (*The People, ex rel. McMaster and Harvey,* v. *Supervisors of Niagara County,* 4 *Hill,* 20.   *Willoughby* v. *Comstock,* 3 *Id.* 389.   *The People, ex rel. Bank of Watertown,* v. *Assessors of Watertown,* 1 *Id.* 616.) (*a*)   But it has not been decided that an individual banker under that law is a corporation; and I presume no such decision will be made until the nature, attributes and properties of corporations shall be essentially and radically changed.   It is sufficient to mention one indispensable characteristic of a corporation to show that an individual banker cannot be one; and that is, its principle of succession and perpetuity for the period of existence assigned to it by its creator.   A private banker under the act to authorize the business of banking, and the various acts amending the same, has no more the character of a corporation than a merchant, a lawyer, or any other individual.   A plain distinction is kept up throughout those statutes between individual bankers and the associations thereby authorized.   There are various provisions applicable to those associations which do not relate to individual bankers, and *vice versa.*   It is supposed by the de-

(*a*) See also *Leavitt, receiver, &c.* v. *Blatchford,* (5 *Barb. S. C. Rep.* 9; *S. C.* 3 *Comst.* 19.)

fendants' counsel, that by the 3d section of the general banking law, all the provisions of law relating to the chartered banks of the state, and among them, the above mentioned section of the act of 1835 restricting moneyed corporations in relation to the sale of drafts, are made applicable to private and individual bankers as well as to banking associations under the statute. That 3d section authorizes the persons and associations therein referred to, after certain things have been done, to loan and circulate their notes as money, according to the ordinary course of banking business as regulated by the laws and usages of this state. It will be seen that the section only provides for the loaning and circulation of the notes as money. It contains no provision concerning drafts, and does not have the effect which is sought to be given to it. The prohibitory section relied upon is in relation to drafts of moneyed corporations, and doubtless includes banking associations under the statute; but we think that individual bankers are not included.

The defendants also insist that the note in suit is void for usury, on account of its having been made a condition of the discount that the note should be made payable in Troy; also on account of the premium of exchange exacted and received, and taking too much for discount.

The evidence does not warrant the assumption that the plaintiffs made it a condition of the discount of either of the notes that they should be made payable in Troy. As to the first note, the evidence does not disclose under what circumstances it was discounted; and as to the second, the proof shows that it was made and presented for discount in its present form. And there is not a word of evidence tending to show that the plaintiffs made it a condition of the discount that it should be payable in Troy. Sanford stated he had produce east; and if we are to indulge in any presumption on the subject, it is that he wished to anticipate the proceeds of his produce for the purpose of paying the note which was about to mature, and drew the note payable at Troy, expecting to pay it when due with the sales of his produce there, and save the expense of transmitting the funds. There was at least evidence enough on that subject to

Cuyler *v.* Sanford.

submit to the jury to say whether the note was not made payable at Troy for those reasons. It is sufficient, however, to say, in relation to this objection, that it does not appear that any negotiation had taken place with the plaintiffs in relation to the place of payment of the note; or that the plaintiffs had ever seen or heard of it until it was made and presented to them in its present form, for discount.

It is therefore unnecessary to decide what would have been the effect on the question of usury if the plaintiffs had imposed it as a condition of the discount that the note should be made payable at Troy.

With respect to the premium of exchange charged and received upon the draft, there is nothing to show it was exorbitant or unusual. On the contrary, it appears that at the time this draft was made, the plaintiffs' usual charge of premium on similar drafts was 5-8ths of one per cent, and the charge in the present case was one-half of one per cent; which was also shown to be the usual rate of exchange charged by the Bank of Geneva. Besides, the case shows that Sanford was offered the money (currency) or a draft at his election, and he elected to take the draft. In a case where there was evidence tending to show that the premium charged was unreasonable or exorbitant, as a general rule the question should be submitted to the jury to say whether the transaction was intended as a cover for usury.

I am at a loss to understand what the defendant's counsel means by the expression in this point, that "too much was taken for discount," unless it is that the discount on the note in suit was computed for a longer time than from its date to its maturity. The discount was computed for thirty-five days. The note is dated the 3d of January, payable in thirty days, and would consequently mature on the 5th of February. The proceeds were paid to Sanford on the first day of January, and it was proper to charge the discount from that time to the 5th of February. There was therefore no usury in this respect.

The nonsuit must be set aside and a new trial granted.