CUYLER and SEXTON *vs.* SANFORD and others

A loan, to be repaid at a future day, at a place other than that where the loan is made and where the parties reside and carry on business, is not necessarily usurious, although the rate of exchange, at the time of the loan, between the place of the contract and the place of payment is in favor of the latter. JOHNSON, J. dissented.

And a lender may exact as the condition of a loan that the money shall be paid at a different place from that where the loan is effected, although the money, when so paid, may be worth more to him at the former than at the latter place. JOHNSON, J. dissented.

The state of the exchange, when the money becomes payable, determines the question whether the lender receives more than seven per cent. What that rate of exchange will be it is impossible with legal certainty to foresee, or to say that it may not be for the benefit of the borrower, or to the loss of the lender, or both. *Per* WELLES, J.

THIS suit was commenced prior to the code of procedure. The declaration was against the defendant Sanford as maker, and the defendants Pettit and Johnson as indorsers, upon a note in words and figures following:

" Palmyra, January 3d, 1848.

"Thirty days from date I promise to pay to the order of J. C. Pettit, one thousand dollars, payable at the Farmers' Bank of the city of Troy, for value received.      J. L. SANFORD."

(Indorsed)      " J. C. Pettit.

Robert Johnson."

A payment of $148,25 was indorsed on the note. Upon the trial at the Wayne circuit in April, 1850, before Selden, J., the signatures of the maker and indorsers were admitted by the defendants' counsel. The plaintiff then proved the regular demand and non-payment of the note at its maturity, and notice thereof to the indorsers. Also a computation of the interest due, and rested. The defense set up by the defendants was that the note in question was void; first, for usury; and second, that the proceeds of the note were paid by the plaintiffs, who were individual bankers under the general banking law, to Sanford, the maker, to be used in taking up a previous note for the same amount between the same parties, upon which draft a premium

was charged, &c. Considerable evidence was given by the re-spective parties touching the several points and questions discussed in the opinions which follow. The positions of the counsel for the defendants, and the rulings of the justice presiding at the trial thereon, are fully stated in the prevailing opinion of the court. The plaintiffs recovered a verdict for the amount due upon the note, which the defendants now moved to set aside, and for a new trial.

*T. R. Strong*, for the defendants.

*A. Worden*, for the plaintiffs.

WELLES, J. At the close of the evidence, the court was requested to charge the jury, 1. That if the note of Sanford, which fell due 3d January, 1848, was, at the time it was discounted, worth more to the plaintiffs by means of its being made payable at Troy, than a note payable at Palmyra, where Sanford and the plaintiffs resided, and carried on business, on account of funds at Troy being worth more than funds at Palmyra, and if it was not made payable at Troy at the *bona fide* request, or for the accommodation of Sanford, it was usurious and void. 2. That if said note was, at the time it was discounted, worth more to the plaintiff, by reason of its being payable at Troy than if made payable at Palmyra, and the plaintiff made it a condition of the discount that they should have a note payable at Troy, the note was usurious and void. The court declined to charge in the terms proposed, but charged instead thereof as follows, viz.: "While I do not entirely dissent from the position assumed in these two points, I cannot, nevertheless, concur in them to their full extent. Whether a note made payable at a distant place, where funds are more valuable than at that where it is discounted is usurious or not, depends upon the circumstances attending the transaction. A purchaser of produce having funds in the hands of his factors, at an eastern market, may draw a draft upon those funds, or make a note payable at the place where the funds are, relying upon the funds to meet it, and neither will be

Cuyler *v.* Sanford.

usurious. In such a case it can make no difference whether the borrower or the lender selects the place of payment, or whether it is or is not made a condition of the loan that the note shall be made payable at the place where the funds are. It is a legitimate business transaction, and it is of no consequence which party is most benefited by it. The points under consideration, in assuming that if the place of payment of the note in question was not chosen by the maker for his own accommodation, or if it was made a condition of its discount that it should be made payable in Troy, funds there being more valuable than at Palmyra, then it would be usurious, irrespective of all other considerations, go farther than I think the law will warrant. If the place of payment grows naturally out of the course of business of the maker of the note, and is selected with a view to funds of his which are there, then it is no usury. So if the maker of the note have no funds at the point where the note is made payable, at the time it is discounted, but have produce there or on the way, which is to be sold, and the note is made relying upon the avails of such sale to meet it, the transaction is not usurious. If, on the other hand, the maker of the note has no funds at the place where the note is made payable, nor any reasonable expectation that he will have funds there, growing out of his legitimate business, to meet the note, but it is expected, by both parties, that the borrower will have to place the funds there for the especial purpose of payment, the note is usurious, whichever party may have proposed the arrangement. When a note is made payable at a distance, to meet funds there or expected to be there, the benefit to the lender, if any, is a mere incident to the course of business. All that the maker contracts for, in such a case, is to apply the funds to the payment of the note. But when he promises to pay at a point where he neither has, nor expects to have funds, he agrees virtually to do more, to wit, to transport the funds to the place of payment, for the benefit of the lender. This addition to the mere agreement to pay makes the note usurious and void."

The court, at the request of the defendants, counsel, charged the jury that if the first note of Sanford, which fell due January

Cuyler v. Sanford.

3d, 1848, was usurious, and if the note in suit was made and discounted to pay the former note, the plaintiffs being acquainted with the object, and still remaining the owners of the first note, the note in suit was usurious and void.

The defendants' counsel then made a like request in regard to the note in suit, precisely as he had previously in the two first points requested in respect to the first note, which request the court refused, and charged instead thereof, as he had done upon the previous request.

The counsel for the defendants then requested the court to charge as follows, viz.: 1. That if the note in suit was made and discounted to procure funds to pay the first note, and if the plaintiffs were informed of that object, and still owned the first note, and intentionally charged or deducted interest on the note in suit for thirty-five days, the last named note was usurious and void. 2. That if the note in suit was discounted by the plaintiffs' issuing the draft on Albany at one half per cent premium for difference of exchange, and the object of the note and discount, to the knowledge of the plaintiffs, was to pay the former note discounted by, and which still belonged to the plaintiffs, the last note was void. The court declined to charge as requested in either of the last two propositions. Exceptions were duly taken by the defendants' counsel to the various rulings of the court in his charge to the jury adverse to the views and requests of the defendants' counsel, and in declining to charge as requested.

If the conclusion to which I have arrived in this case is sound, the charge of the justice before whom the action was tried, was more favorable to the defendants than they had a right to require. The first legal position of the defendants' counsel, is that a loan to be repaid at a future day, at a place other than that where the loan is made and the parties reside and carry on business, the rate of exchange at the time of the loan, between the place of the contract, and of the payment, being in favor of the latter, is usurious, unless the place of payment was fixed upon by the parties at the *bona fide* request or for the accommodation of the borrower.

Cuyler *v.* Sanford.

To render a contract usurious there must be an agreement by which the lender is to receive, directly or indirectly, in money, goods, or things in action, or in some other way, a greater sum, or greater value than at the rate of seven dollars upon one hundred dollars for one year. (1 *R. S.* 771, 2, §§ 1, 2. 2 *Id.* 56, 3*d ed.*) The defendant's argument is, that as the notes in question were made payable at Troy, where money was worth one half per cent more than at Palmyra, the plaintiffs would, upon payment of the notes according to their terms, receive one half of one per cent upon the amount loaned, more than the law allows; and that the defendant, by the contract, undertook to do more than to repay to the plaintiffs the amount loaned with seven per cent interest, to wit, that he undertook to carry the money to Troy. This reasoning, while it is quite plausible, it seems to me is too speculative and uncertain to prevail in a court of justice. It is to be borne in mind that the contracts in this case not only contemplated a place of payment of the loan different from the one at which the loan was made, but looked to a future period for the time of payment, while the proposition of law contended for, supposes a difference in the rate of exchange between the two places, *at the time of the loan.* How could it be certainly known that at the maturity of the note, there would be any premium on exchange between Palmyra and Troy; or if any, whether it would not be in favor of Palmyra? We shall be obliged to speculate upon contingencies and probabilities, in order to apply the reasoning of the defendants' counsel in regard to benefit to the lender, to the premises. The rule, to be a good one, must be applicable to cases where the places of the loan and the payment, are other than Palmyra and Troy, and where the time of payment is more than thirty days. It may be highly probable that the rate of exchange would undergo no essential alteration between Palmyra and Troy during the periods which the notes in question had to run. But suppose the place of the residence of the parties to the loan, and the transaction itself, to have been Rochester, the place of payment Buffalo, and the time of payment five years, with the rate of exchange at the time of the loan one-eighth of one per cent in favor of Buffalo. Would not

the rule contended for be equally applicable? In both cases, the one just supposed and that at bar, the state of the exchange, when the money becomes payable, determines the question whether the lender, in the light of the counsel's argument, receives more than seven per cent. What that rate of exchange will be, it is equally impossible in both cases to foresee with legal certainty, or to say that it may not be for the benefit of the borrower, or loss to the lender, or both.

The argument of loss, expense, or inconvenience to the borrower has no application to the question. Usury is a creature of the statute. It is *malum prohibitum* merely; and we are to see what the statute prohibits. Its language is exceedingly comprehensive, but the prohibitions relate to what the lender is to receive for the loan or forbearance. The words are, "shall, directly or indirectly, *take* or *receive* in money, goods or things in action, or in any other way," &c. It is of no consequence, to the point under consideration, what it may cost the borrower to pay the money. A creditor has in all cases the right to demand specie of his debtor. There have been times, when, to insist upon that right, would have been ruinous to many debtors. The question always is whether the contract secures to the *lender* more than seven per cent.

It appears to me that there is no better or safer test of this question than to inquire whether by the contract, were it not for the usury law, any thing more than seven per cent could be recovered. Judging the present case by this test, most clearly there was no usury, in view of the proposition under consideration. The recovery upon the note would be the same whether payable at Palmyra or Troy. A tender of the amount of the note to the plaintiffs personally, the next day after it matured, would be good, beyond a doubt. No one will pretend that they would have the right to demand any difference in exchange between Palmyra and Troy. In every aspect in which I have been able to place the subject, it seems clear that the legal effect, so far as respects the amount which the lender is entitled to receive, is the same as if the notes were payable generally, or at Palmyra or any other place.

The next position of the defendants' counsel is that a lender has no right to exact as a condition of the loan that the money shall be paid at a different place from that where the loan is effected, provided the money when so paid will be worth more to him at the former than the latter place. The only real difference between this and the other position is, the condition exacted in relation to the place of payment.

If the view I have taken of the first position is correct, it fully disposes of this ; as, most clearly, if it was not usury to take the notes payable at Troy without reference to the request or accommodation of Sanford the borrower, it was not unlawful for the plaintiffs to require them to be made payable there. It was urged, upon the argument, that the case at bar was within the principle of *The Seneca County Bank* v. *Schermerhorn*, (1 *Denio*, 133.) That was a flat case of usury, and bears little or no resemblance to the present. Schermerhorn paid $22,50 to get two notes then in bank, amounting to $3000, renewed for three months, besides paying the regular discount on them for that time. It was a case within the letter and spirit of the statute. The bank took whatever the drafts on New-York and Albany were worth above par, more than seven per cent upon the forbearance of the debt. That was proved to have been $22,50. The drafts were payable at sight, and were proved to be good, and would at the time of the transaction, command a premium of just that amount. It is difficult to conceive a more palpable case. The case of *The Bank of the U. S.* v. *Davis*, (2 *Hill*, 451,) which has been cited, was also a clear case of usury. The paper discounted in that case was drafts on New-York, on time. The transaction took place at the plaintiffs' branch at Erie, Pennsylvania. In addition to the legal discount, one half of one per cent was deducted, as a charge for collection in the city of New-York, while at the same time the branch at Erie was selling drafts on New-York at one half per cent premium.

I deem it unnecessary to dwell longer on the points and positions of the defendants' counsel, involving the question of usury. No case which I deem parallel with the present has been cited where the transaction has been held usurious. And

the fact that none has been found, is strong evidence to my mind that there was no usury in this case; especially when it is a fact which every body knows, that transactions of precisely the same character have been of daily occurrence for a great number of years, both in England and this country. The positions which I have discussed are the strongest ones for the defendant, and if my views in relation to them are sound, they dispose of the minor and subordinate ones on that subject.

When this case was before us on a former occasion, (8 *Barb.* 225,) it was contended that the note in suit was void on the ground that the proceeds were paid to Sanford in a draft to be used in taking up the first one, upon which draft a premium was charged, as being in violation of the statute on that subject. (*Laws of* 1835, *ch.* 307, § 1. 1 *R. S.* 727, § 32, 3*d ed.*) We then held that the statute only applied to moneyed corporations; and as it appeared that these plaintiffs were individual bankers and not an association, under the general banking law, and consequently not a corporation, were not within the act. It was not shown on the last trial that the plaintiffs were an association, under the law. They were engaged in banking, and kept a banking office, discounted notes, and issued bills and drafts, and their bills circulated as money. All this may be done by private bankers as well as associations. On this question the defendants held the affirmative, and when they attempt to bring the plaintiffs within a statute which is penal in its nature, they should be held to make clear proof. In my opinion there was not enough shown on that subject to justify the court in submitting the question to the jury, and consequently that he was right in declining to do so.

On the argument of this case we were referred to the case of *Gillet* v. *Moody*, (3 *Comst.* 479,) as favoring the idea that individual bankers, under the general banking law, were equally with moneyed corporations within the prohibitions of the statute referred to. I have examined that case and do not find that it conflicts at all with our former decision in this case.

The bank, in the case in Comstock, was an association under

Cuyler *v.* Sanford.

the law, which has been over and over held to be a moneyed corporation.

In my judgment a new trial should be refused.

TAYLOR, J. concurred.

JOHNSON, J. (dissenting.) As I understand the charge of the judge in this cause, the usurious character of the transaction was made to turn exclusively upon the question whether the maker of the note, at the time of the discount, had funds at the place of payment, or expected to have funds there in the course of his business, to meet the note when it fell due. If the jury found the affirmative, then the transaction was not usurious, whatever the motive of the lender may have been, or the terms he may have imposed as a condition of the loan. But if, on the contrary, they should find that it was the expectation of both parties that the maker was to place the funds there for the express purpose of meeting the note, not having funds nor expecting them there, in the course of his business, then it would be usurious, whichever party proposed the arrangement.

I think it will be found exceedingly difficult to vindicate this as a legal proposition. The distinction taken is unsound, and without authority to support it. According to this rule the contract would derive its usurious character not from the advantage it secured to the lender over seven per cent, but from the disadvantage and inconvenience it imposed upon the borrower in making payment. It is obvious this is no test.

Usury is a question of fact of intent; and the true inquiry is whether the transaction secures to the lender any greater sum, or greater value, than seven per cent per annum for the use of his money; and whether such was the intent with which it was entered into.

It is quite clear, I think, in a case like the present, that the advantage to the lender would be just the same whether the borrower had funds at the place of payment at the time of making the loan, or placed them there afterwards. Nor can I see any material difference in the disadvantages to the borrower,

in the two cases.  Both parties resided at Palmyra, and in the absence of all evidence to the contrary, I apprehend we are to assume that funds when placed at Troy would be equally valuable to both parties, so that if the borrower had them there at the time of making the loan, they were worth just so much more to him as it would cost to transmit the same amount of other funds to the same point.

But the object of the statute is to prevent the lender of money receiving, or entering into any contract by which he is to receive, in any way, or in any form, any greater sum or value than seven per cent; and does not look at all to the trouble or inconvenience of the borrower in making payment.  If the lender, by the contract, gets nothing more than legal interest, it is not usurious, whatever trouble or expense its performance may occasion him who is to make the payment.

The true point, as I conceive, presented by the request of the defendant's counsel, to the judge, to charge the jury, and the exception to the refusal, is, whether the defense of usury can be predicated upon a contract for the loan of money and its repayment at a distant point, which is entered into with the intent and for the purpose of securing to the lender the difference in value, or in other words, the rate of exchange between the two points, and not for the convenience or accommodation of the borrower, or at his solicitation.  Is this rate of exchange, or tax upon the transmission of funds from one point to another, which constitutes the difference in value, between the same nominal sums at different points, an essential thing, of any definite and real value in a legal sense?  Nothing can be more clear than that it is so.  It is the daily and constant subject of contract and negotiation in the business transactions of the country. And our courts have uniformly so regarded it.  There are numerous decisions in our state upon this subject, and they all treat this rate of exchange as a thing of substantial value, as much as the rate of interest.  If they are not utterly unsound in principle, it follows that any contract or agreement which secures to the lender of money this difference, in addition to the seven per cent allowed by law, is usurious.  The statute declares

Cuyler *v.* Sanford

that all notes, and all contracts or securities whatsoever, with certain specified exceptions, whereupon or whereby there shall be reserved, or taken, or secured, or agreed to be reserved or taken, any greater sum or greater value for the loan or forbearance of money, than at the rate of seven dollars for one hundred dollars for one year, shall be void. If a party by his contract gets the difference of exchange, that being a matter of substance and legal value, in addition to seven per cent, it is an agreement to pay a greater sum, or greater value than seven dollars on one hundred. It is perfectly immaterial by what shift or device, or in what particular thing or manner the "greater value" is to be realized. Courts are to look at the substance and meaning of the arrangement, and see whether the Protean spirit is there embodied, whatever disguise it may have assumed, to escape detection.

The argument that because money is frequently, if not uniformly, loaned in Troy or New-York at lower rates than in Palmyra or Rochester, it must therefore be worth less at the former points, to persons residing at the latter, is unsound and fallacious. Money may be worth much less to a person residing in New-York, for the purposes of loan or other investment, than the same amount to one residing at Rochester, for loan or investment at the latter place, while at the same time, owing to the demands of business and the uniform course of trade, money in New-York is worth a premium to the merchant or banker of Rochester. Courts can scarcely shut their eyes to the notorious fact that thousands of dollars are paid daily in premiums or rates of exchange by business men in the country for money in deposit at the great commercial centers where the purchases for the country are chiefly made. But if they could, and are only permitted to look at the evidence on the trial, in regard to questions of this character, the proof here is clear and undisputed as to the exchanges between Palmyra and Troy, and the difference in value, or the premium, that funds in the latter place bore in the former. It is said, however, that here the payment was to be made at a future day, in Troy, and although the evidence establishes the fact of a difference in favor of funds at Troy at

Cuyler v. Sanford.

the date of the loan, it does not follow that it would remain so up to the time of payment, or that the parties entered into the contract with any such expectation, and that such an assumption is too speculative and uncertain to prevail in a court of justice. It seems to me, however, that the general and prevailing tendencies of the business of the country are far more certain and uniform than this view of the case supposes. Until some extraordinary and unlooked for revolution occurs in the domain of trade and commerce, we may look for the current of money to flow from the country to the great marts, where the merchandise of the world is purchased and distributed, with about the same certainty that we may for the streams to seek the ocean. But, independent of this, it seems to me where it is clearly shown that at the time of the loans, and at the place where the lender resided, and the loan was made, funds at some distant point bore a premium, and the lender made it a condition of the loan that payment should be made there, the law will presume that the condition was imposed in reference to such advantage, and for the purpose of securing it by the arrangement. It can hardly be presumed that the lender would impose conditions to his own injury, or which might operate injuriously, owing to the uncertainty and shifting nature of the foundation upon which they were based. The established rate of exchange between two points connected by regular channels of communication and reciprocal trade, is neither speculative nor uncertain. An element which enters into the calculations and touches the interest of every business man in the community, ought not to be treated as too shadowy and unreal for the cognizance and grasp of a court of justice. It is a stubborn reality, and the tribunal that would interpose any shield between the rapacity and artifice of the usurer and the needy borrower, must deal with it as an existing and undoubted fact. And I have no doubt that the rate of exchange between two points, in the usual course of business, is as much the subject of judicial notice as the course of trade between the same points.

The legislature struck at the very principle here involved when they prohibited moneyed corporations, receiving the pre-

Cuyler v. Sanford.

mium on drafts made by them, which were used in payment of notes due to, or discounted by, such corporation. (*Sess. Laws of* 1835, *ch.* 307, § 1.) What the legislature thus prohibited, these plaintiffs did in regard to the first note, of which the note in question was in fact, though not in form, but a renewal. Although it was clear that the practice was plainly against the policy of the law, this court held that the statute did not apply to the plaintiffs, who were individual bankers and not a moneyed corporation. The practice in that case, so nearly connected with the note in this, if any thing were needed, might afford a sure index to the design in making this note payable at the same place, and convince us that the plaintiffs at least did not regard the existing rate of exchange as fictitious or uncertain.

It is plain to be seen that if this practice is sanctioned and individual bankers and moneyed corporations are permitted to annex, as a condition to every loan, that payment shall be made in New-York or London or Paris, or wherever the premium may range highest, the legislative prohibition will be completely nullified in its spirit and purpose, and there will be a sheer end to all loans and discounts payable at the counters where they are made.

The plaintiffs' counsel contends that to render the contract usurious, it must be such that the plaintiffs could have recovered more than seven per cent by action, but for the statute. But I apprehend the true inquiry is what will the lender receive in case the contract is performed according to its true intent and meaning, and not what damages will the courts award in case it is broken? Would the lender, by the strict performance of the contract according to its spirit, receive a greater sum or greater value than seven per cent?

I confess I am unable to perceive why the cases of *Seneca County Bank* v. *Schermerhorn*, (1 *Denio*, 133,) and *Bank of U. S.* v. *Davis*, (2 *Hill*, 451,) are not directly in point and entirely decisive of this case. These are conceded to be clear cases of usury. In the first case Schermerhorn, as an inducement to the bank to renew the notes and extend the time, transferred to it, at their nominal amount, two drafts on New-York

Cuyler *v.* Sanford.

amounting to $3000. Why was this usurious? The drafts would only enable the bank to demand and receive $3000 in gold and silver, at the place of payment in New-York, and that was precisely what the bank paid for them at Waterloo. It was usurious because, at the time, the drafts were worth some $22,50 more than the nominal amount at Waterloo, in the rate of exchange. In New-York the drafts were worth only the nominal amount, but not so at the place where the loan was renewed or extended. Suppose instead of transferring these drafts at the time, it had been agreed as a condition of the renewal, that Schermerhorn should pay the notes thus renewed, at their maturity in ninety days, in these same drafts, without exacting any premium? Would that have altered the character of the transaction? Could it then have been said it was so doubtful whether at the end of ninety days drafts on New-York would bear any premium at Waterloo, that no taint of usury attached? Clearly not. It would be clearly seen in such a case that the parties, at least, did not regard the advantage they bargained for as a doubtful one. Nor would the principle be altered a single tittle had the condition been to pay gold or silver in New-York, and the notes been made payable there. It is enough that courts can see that the lender contracts for an unlawful premium; that it is reserved or taken, or agreed to be, by the terms of the contract, in a value of some kind, to authorize them to declare such contract void. It is not necessary to establish the fact that the lender will inevitably realize the unlawful premium which he has bargained for.

For these reasons, amongst others, I am constrained to dissent from the conclusions of my brethren who were present at the argument.

I am of opinion that the justice erred in his charge to the jury, and that he should have charged substantially as requested by the defendants' counsel, and that a new trial should therefore be granted.

New trial denied.

[MONROE GENERAL TERM, June 3, 1851. *Welles*, *Taylor* and *Johnson*, Justices.]